Good morning. My name is Rebecca Penel. I represent Mr. Garcia-Arredondo. There are several deportations in this case, and of course the issue is whether or not the criminal prosecution was flawed because of flawed deportations. And as I opened with the reply brief, I think the crux of the debate in this case is whether or not everything is related back to the 1999 deportation. The simplest way to look at it is to see what the Bureau of Immigration Appeals says, and they say these types of things are related. If a person loses their status at an initial hearing, in the few cases where in the civil proceedings the BIA says you can do a collateral attack, they've forgiven the unlawful entry at the later proceeding and treated the two as connected. But where is the prejudice to your client? Because even assuming that there's a due process violation somewhere along the way, wouldn't he inevitably have lost his LPR status? Oh, I don't think so, Your Honor. He would have been eligible for cancellation of removal, and the IJ in 1999 mentioned that but didn't explore it. And in fact, what I found most troubling about the proceeding is the IJ didn't explain the difference between voluntary departure and cancellation of removal. Cancellation of removal would have allowed Mr. Garcia-Arredondo to keep his status that he'd had in the United States for 30 years, whereas voluntary departure means, although this is not a deportation, that's the only benefit. If you lose your status, it's going to be very hard to come back to the United States. Given the rules of exclusion, you probably can't come back. And if you come back, we can deport you pretty much automatically, almost like a reinstatement. So it was a very significant thing losing his status, and that was not explored with him, nor was bail discussed with him. And I noted in looking at the attorney notes in this case that we submitted under seal, he was given bail in the 2002 proceeding according to the attorney notes. He was given $10,000 bail, and yet that wasn't mentioned at the more important proceeding in 1999 where he might have been able to post a $10,000 bail using a bail bond for part of it perhaps, gotten out of custody. His entire family is U.S. citizens. All of his siblings and his mother, who was alive at the time, are U.S. citizens. But he's not. He had an opportunity for years to naturalize, and he didn't, so we are where we are with him. We are where we are. But all of that should be taken into account on whether or not he could have had a plausible case, and that's all that we need to show, a plausible case of retaining his LPR status and getting cancellation or removal. I think if the court has questions about that issue, that this case should be remanded to Judge Shea for some findings of that, because Judge Shea didn't get to the actual issue of whether or not there was a plausible case. Judge Shea mostly looked at the relatedness of the proceedings and then said, well, cancellation of removal was discussed, and we disagree that that was sufficient to mention cancellation of removal. And then as soon as Mr. Garcia-Arredondo brings up the idea of voluntary departure, just giving him that without explaining the difference, without pursuing the fact that Mr. Garcia-Arredondo seemed to be worried about bail, not mentioning bail, this Court has plenty of cases where a person cannot validly waive their right of an appeal in an immigration case without the consequences of that right of appeal being explained. And certainly for myself, as defense counsel, having obligations under Padilla to explain immigration consequences, to expect that of an immigration judge, of explaining just the difference at the very least between voluntary departure and cancellation of removal for someone who'd been in the country for so long, would have been critically important. So I do think that that was below the standards for due process in an immigration hearing, and given his long status in the United States, he had a plausible case for getting that removal canceled. He was not an aggravated felon, so he was not an automatic out. So, counsel, doesn't our case authority say that in order to collaterally attack a prior proceeding, there has to be a showing of a gross miscarriage of justice? That's only in the civil context. And so things are different in the civil context, and the cases, for instance, of United States v. Arias-Ordonez, where it talked about reinstatement proceedings, the difference between a reinstatement proceedings in the civil context versus the criminal context. In the civil context, it is very difficult to collaterally attack a prior proceeding. But in the criminal context, you're facing Mendoza-Lopez, the Supreme Court case, which doesn't require gross miscarriage of justice. It requires a due process violation. As I understand the gross miscarriage of justice, it applies. It's only applied in two immigration cases. It applies when someone is not deportable at the time of the proceeding. It's a gross miscarriage of justice for them to be deported. The same is not true in the Mendoza-Lopez deprivation of due process cases. Time and time again, a person is deportable, but they're not adequately advised of relief from deportation, or they don't adequately waive their right of appeal of the relief from deportation. So the two concepts are very different, and this Court has recognized in the Hernandez case that I cited as well, the difference in the gross miscarriage of justice standard, which is quite difficult and very rare. Only two cases versus the criminal context, whereas the criminal disabilities provide a greater avenue for collateral attack. And therein lies the history of the case. Can I ask you, what was wrong with the second deportation, the 2002? Well, the 2002 deportation, of course, if connected to this one, you just can get back to it. No, well, tell it by itself. Sure. What's wrong with it? Well, to the extent that he could have raised a claim of gross miscarriage of justice, he was not given the opportunity for continuance. The judge just denied a continuance. But that was a discretionary call. Sure, but the discretionary call. So what legal objection is there to the judge denying continuance? Well, it's an abuse of discretion if the person has a legitimate issue that they want to raise and legitimately appears like they don't have enough time. Did he make it clear what they were? Yes, they did. They said that they wanted to look at the prior 1999 proceeding, that he just hired an attorney, and the judge said that's speculative, and the judge said you can do that during the pendency of the appeal. If the judge recognized that it was possible for him to raise a collateral attack, rather than saying you can do that during the pendency of your appeal, he should have given a continuance. And that gets to the second issue, that his attorney, who since has been disbarred by this court and by the Washington State Bar Association for failing to file appeals, failed to file an appeal in this case. So the very possible way that maybe he could have collaterally attacked the 1999 proceeding was stripped of him, and this court has recognized that there can be a due process violation for ineffective assistance of counsel, particularly when someone is counting on their counsel to file an appeal and they don't and that person is detained. To the extent that he couldn't have attacked the 1999 proceeding during the 2002 proceeding, then the two are just inextricably intertwined. The 2002 proceeding is like a reinstatement proceeding. Its validity depends on the 1999, and the 1999 was flawed. So that's our position with how the two are connected. I don't know if the panel has more questions right now. If not, I might want to reserve the rest of my time. You may do so. Thank you. May it please the Court, Alexander Eckstrom, Assistant United States Attorney, on behalf of the Appellee United States of America. Your Honors, if I may, I would address the question raised by Judge Noonan first. It's the government's position that the immigration judge in 2002 had before them two claims. First, that Attorney Barr had asked the ability to determine whether or not the defendant had in the prior hearing been advised of cancellation of removal and expressed a concern that the immigration judge in 1999 had treated the prior assault conviction as an aggravated felony, which it clearly was not because of the amount of time that the defendant had spent in custody on that assault too. And looking at the standard of good cause shown, the government believes that there was no error in denying the continuance. But the government's main argument is that the 2002 proceeding and the 1999 proceeding are decoupled. The 2002 is the predicate for the 2007 reinstatement, but at that time the defendant had entered without inspection, admitted that he was guilty of the offense, and regardless of any other claim that he can make, he was still properly removable based on that NTA for that offense. And the government has cited the case law indicating that an LPR is still deportable if they enter without inspection. We've cited Ruiz and Sotelo-Montragon v. Ilchert. And similarly in this case, we believe that the defendant's request to be excused for the illegal entry is as unavailing as it was in Sotelo. Counsel, do you agree with opposing counsel's position that all he had to show was that there could have been relief to which he was entitled? No, the government believes that the cases cited for Ruiz and the other cases with the gross miscarriage of justice applies. However, the government would argue in the alternative that regardless of which standard this court would adopt, there simply was no error, either in the 2002 or in the 1999. If one looks at excerpt of record 53 through 55, it begins with an explanation by the IJ of cancellation of removal. This is an individual who is college educated. The defendant's transcript is made part of the record. In the 140s or 150s of the excerpt of record, I forget which. And it's repeated several times. The IJ has the obligation under Murrow and Klon 249F3-1180 to inform the individual of their apparent eligibility, but that was done. It was done repeatedly, and the defendant made a knowing and intelligent decision to request a voluntary departure and receive the benefits therefore. Dealing with the issue of the possibility of bond, the government has cited several cases including Corrales-Beltran 192F3-1311, indicating that a failure to advise the alien of a right to bail does not invalidate the waiver. In this instance, the IJ both in 1999 and in 2002 properly advised in the first instance and properly denied the continuance in the second instance. I have nothing further unless the Court has questions of me. Judge Noonan, do you have any questions? I do not. I think we don't. Thank you. Ms. Pinnell, you have some time remaining for rebuttal. Thank you. Mr. Ekstrom mentioned that the Court explained cancellation of removal to Mr. Garcia-Arredondo. Certainly the Court can look at the record and read that. There was not much of an explanation, and there certainly wasn't an explanation of the difference between cancellation removal and voluntary departure and the impact on that, on Mr. Garcia-Arredondo's permanent residency in the United States. But counsel, how much is required? Well, you can certainly look, Your Honor, at some of the other cases where immigration judges have done far more. But I think it's minimal to explain what the difference is between two forms of relief from deportation and what they mean. But the fact that immigration judges may have done more does not translate into a requirement. Sure. But this Court has required in cases such as United States v. Ramos, there be evidence that the alien is apprised of the meaning of his waiver of rights. What's the meaning of the waiver of rights? That he forever loses his lawful permanent residency in the United States. That that is required for a voluntary and intelligent appeal, a waiver of rights. And I certainly think it's true in this context where the Supreme Court has said, for a person convicted of a crime, perhaps the greater burden is losing their status in the United States than even prison time. So for something like that, to minimally require the type of things that is done in a Rule 11 colloquy with the judge, where the judge makes sure. Is there any case in which this Court has required the kind of detail for a Rule 11 colloquy of an immigration judge? The Court hasn't gone into that sort of specifics. Kind of a yes or no answer. No, I've not seen mentioned Rule 11. But I have seen that the judge must explore and explain all avenues of relief. And I don't think explaining is simply giving the label. Explore and explain means something more than that. It doesn't have to mean much more for that not to have been done in this case. So what case authority are you relying on to say that what the judge did in this case was not adequate, even granting, excuse me, that he could have done more? But what case says that this is not sufficient? Well, certainly every factual scenario is different. But looking at the cases that require exploration, I would say Jacinto v. INS, United States v. Ramos, are two examples of cases where this Court has required notes, required more. In addition, there's a case, Aguiman v. INS, that's in the briefing, where the court has said that the IJ has a duty to fully develop the record when an alien is pro se, by developing the relevant facts and by providing appropriate guidance on how the alien may apply for relief. So there is authority, especially when the alien is pro se, for the judge to do more than a cursory review. And it's our position it was just a cursory review in this case. Thank you, counsel. The case just argued is submitted, and we appreciate the arguments from both sides. Our next case on the argument calendar is United States v. Parisienne.
judges: Noonan, Graber, Rawlinson